MEMORANDUM OF DECISION
On April 5, 2000, the Department of Children and Families, hereafter "DCF," filed a petition seeking an adjudication of neglect regarding Avia K., born on ___. On June 12, 2000 DCF filed a petition seeking the termination of the parental rights of Avia's biological parents, Lisa F. and Felton K. On September 13, 2000, the court (Swienton, J.), consolidated the petitions for trial. DCF alleges that Lisa and Felton had neglected Avia by permitting her to live under circumstances or associations injurious to her well-being. DCF also alleges that Avia was, on the date of the filing of the petition, an uncared for child in that Avia required specialized care to meet her physical, emotional and mental needs, and her parents' home could not provide such specialized care.
The coterminous petitions also allege that Lisa and Felton's parental rights to Avia should be terminated because Avia is under the age of seven years, is neglected and uncared for and they have failed, are unable and unwilling to achieve such degree of personal rehabilitation as to encourage the belief that they could assume a responsible position in Avia's life, and that their parental rights to another child have been terminated pursuant to a DCF petition. Connecticut General Statutes § 17a-112(j)(3)(E). Regarding Lisa, DCF additionally alleges that she killed, through a deliberate non-accidental act, a child previously born to her. Connecticut General Statutes § 17a-112(j)(3)(F).
The court finds that notice of this proceeding has been provided in accordance with the Practice Book and this court has jurisdiction. The court further finds that no action is pending in any other court affecting the custody of Avia. The court was presented with thirty-three full exhibits, eighteen photographs and heard the testimony of the social workers, a police officer, the court appointed psychologist as well as the father, Felton K.
1. FACTS
 A. Events Prior to the Filing of the Coterminous Petitions.
Lisa is the biological mother of Avia, the subject of this petition. In addition, she has given birth to three other children prior to delivering Avia. Lisa was born on July 26, 1974 in Connecticut. She is presently twenty-seven years old. Her mother and father divorced when she was approximately seven years old. Following the divorce, Lisa and her siblings remained in the custody of their mother. As a result of "chronic homelessness and mental health concerns"[2] DCF was involved in the lives of Lisa and her family during Lisa's childhood and adolescence. CT Page 11627
According to the evidence submitted to the court, Lisa "has a history of academic and behavioral difficulties." Records reveal that it was her first grade teacher who first observed that Lisa "had a learning disability along with poor relationships with other children."[3]
Efforts were made by the school system to address these issues through special education programs. Lisa also attempted to address the problems by participating in counseling while in high school. Unfortunately, the programs failed Lisa. She did not graduate high school.
She was sixteen on April 21, 1991 when she delivered her first child. Several weeks after the baby's birth, Lisa was charged with Manslaughter in the First Degree in connection with the baby's death immediately following his birth. Following an investigation, the police determined that Lisa had delivered a baby in the bathroom of the home in which she lived with her family. According to the police, Lisa drowned the baby in the toilet. When the police arrived, they discovered a blood-covered bathroom and the body of an infant in the toilet. They also found blood-covered scissors.
The court heard the testimony of Sergeant Jeffrey Emmons. He was the lead detective in the investigation of the drowning death of Lisa's baby. He testified that Lisa denied killing her baby. His report of the investigation, including the Post Mortem Report of the Office of the Chief Medical Examiner along with Lisa's voluntary statements and photographs of the blood-covered bathroom were introduced at trial.[4]
In her statement to the police, Lisa stated that she did not know that she was pregnant at the time of the baby's birth. She reported not feeling well on that particular morning. She believed that she "had a stomach virus like I was getting the flu and I just didn't expect this to happen." She had diarrhea and when she sat on the toilet, "a dead baby came out of my body and just you know a dead baby I saw."
On May 7, 1991, Lisa was arrested on a warrant charging her with Manslaughter in the First Degree. On July 31, 1992, fourteen months after her arrest, Lisa was convicted of Manslaughter in the Second Degree. According to the pre-sentence investigation report,[5] Lisa was convicted pursuant to a plea entered under the Alford doctrine.[6] She did not admit causing the death of her first born. She was sentenced to ten years incarceration, to be suspended after serving one year. Upon her release, she was to serve a period of three years of probation. The conditions of her probation included, reporting to the probation office upon release from prison, keeping the probation officer informed of her address and of her whereabouts, obtaining her high school equivalency diploma, perform two hundred hours of community service and to submit to a psychological evaluation and follow the recommended course of treatment.[7]
CT Page 11628
On February 3, 1993, Lisa was released from prison and advised, in writing, of the terms of her probation. According to her police record,[8] two and one-half years after her release from prison, on December 17, 1995, Lisa was charged with violating the terms of her probation. She was incarcerated pending the disposition of the violation of probation charge.
On January 1996, while in prison waiting for the disposition of this case, she delivered her second child, Dakota, who is issue of her relationship with Felton. Because of Lisa's incarceration and Felton's unavailability, Dakota was immediately placed in foster care. When Dakota was barely nine months old, on September 30, 1996, Lisa was convicted on the pending charge of violation of probation. Rather than revoking her probation and incarcerating Lisa, the court released Lisa from jail and allowed her to remain on probation. The terms of her probation were modified to extend the period of probation from a term of three years to five years. Additionally, she was ordered to report weekly to the office of adult probation, to participate in a treatment deemed appropriate by DCF and to remain living at the address she gave the Office of Adult Probation unless otherwise approved by said office.
On November 12, 1996, six weeks after her conviction on the charge of violation of probation, Lisa was once again charged with violation of probation. Her probation officer alleged that Lisa had left the address where she was expected to live and that her whereabouts were unknown. Lisa was once again incarcerated. She remained in custody from November 12, 1996 until this subsequent charge of violating the terms of her probation was disposed of on April 28, 1997. This time the court disposed of the charge differently; Lisa's probation was revoked and she was ordered to serve thirty months in jail.
As stated previously, Lisa delivered her second born child, Dakota, on January 1996, while she was in prison. Due to Dakota's premature birth as well as other health concerns, he remained in the hospital for two weeks before he was ready to be discharged. On January 18, 1996, given that both of Dakota's parents were unavailable, the court (Sequino, J.) issued an Order of Temporary Custody. In addition to the Order of Temporary Custody, DCF also filed a neglect petition, which was amended on April 26, 1996 to include an allegation that Dakota was an Uncared For child due to his specialized needs.
The court heard the testimony of DCF social worker, Tracy Heinig. She testified that she was the social worker assigned to this family during the year 1996. Her first contact with Felton was on February 20, 1996, one month after the birth of his son, Dakota. He was employed as a hotel CT Page 11629 manager in Baltimore, Maryland. She explained that she attempted to place Dakota with his father through the Interstate Compact on the Placement of Children.[9] This was unsuccessful because the nature of Felton's employment required him to frequently relocate. She further explained that the necessary paperwork could not be completed because of the difficulty in keeping track of Felton.
On May 3, 1996, Lisa and Felton appeared in court and an adjudication finding Dakota to be an Uncared For Child was entered. The court committed Dakota for a period of twelve months and issued a set of expectations to Lisa and Felton.[10] Among the court's list of expectations, Lisa and Felton were to be involved and follow Dakota's medical needs as well as to visit him as often as DCF permitted. Lisa was also expected to follow the recommendations of the probation department and to secure adequate housing upon her release from incarceration. Lisa was also expected to engage in counseling as well as parenting classes.
On April 27, 1997, when Dakota was fifteen months old, his commitment to DCF was extended for another twelve months, from May 3, 1997 until May 3, 1998. Tragically for Dakota, on the very next day following the extension of his commitment to the state, April 28, 1997, his mother was convicted on the pending violation of probation charge. She too was committed to the state. Her commitment, however, was to the custody of the Commissioner of Corrections. As previously stated, that commitment was for a period of thirty months. Notwithstanding the imposition of a two-and-a-half year sentence, the evidence demonstrates that Lisa was released in February 1998, one month after her son celebrated his second birthday.
Despite Lisa's release from jail, Dakota remained in foster care. The record reveals that on April 16, 1998, his commitment to DCF was extended for an additional twelve months until May 3, 1999. This meant that as of April 1998, Dakota had spent the entire two years and three months of his life in foster care. According to Ms. Heinig, a meeting was held with Lisa and Felton on March 17, 1998. The purpose was to discuss the need of the parents to engage in services. Lisa was referred to counseling as well as parenting services. Both of the parents were told that they would need to visit with Dakota on a consistent and regular basis.[11]
On October 28, 1998 six months after Dakota's commitment to the state was extended, Dakota's sister, Acadia, was born to Lisa and Felton. On the date of the baby's birth, the hospital in which Acadia was born made a referral to DCF regarding Acadia. They were concerned about releasing a new born into Lisa and Felton's care, given their knowledge of DCF's involvement with this family. The hospital was also concerned about Lisa's failure to obtain mental health services. On October 30, 1998, CT Page 11630 after conducting a psycho-social evaluation on Lisa, the hospital once again called DCF.
DCF responded to the referral by calling Felton on October 30th while he was at the hospital. The purpose of the call was to set up a home visit. When Felton refused to participate in a home visit, Ms. Heinig and an investigation social worker went to the hospital on that same day. While discussing the matter with the social workers, Felton became increasingly agitated and out of control. The police were called and DCF invoked a ninety-six hour hold on Acadia. On November 3, 1998, the court (Cohn, J.) issued a Order of Temporary Custody along with a set of specific steps.[12] The parents were expected to cooperate with court ordered psychological and psychiatric evaluations.
The court heard the testimony of Jill Amaio, the DCF social worker to whom the case was assigned in November 1998. She testified that on January 29, 1999, the parents entered into a stipulation with DCF. The attorney for Acadia was part of the stipulation.[13] Lisa and Felton agreed that Acadia could remain in foster care while they would work towards the goal of reunification. Ms. Amaio testified regarding the extent of services provided to this family. The services included, a visiting nurse, parent education, the Coordinating Council for Children in Crisis (the 4 C's), Clifford Beers for mental health services, counseling at the Branford Counseling Center, supervised visitation at the Southern Connecticut Therapeutic Visitation Center, transportation services, among others.
The court was presented with the progress reports of the supervised visitation center's observation of Lisa and Felton's interactions with Dakota and Acadia. On January 21, 1999[14] the center expressed concern regarding the parents' capacity to relate in an age-appropriate manner with the children. They recommended that the visits continue in a supervised setting. By April 20, 1999,[15] the center noted that while the parents had made significant progress in parenting skills, there was a need to address and monitor Lisa's ability to "recognize dangerous situations to avert any risk of harm to the children and . . . if Lisa has not processed the first incident in intensive therapy then it is critical in the view of this therapist that she do so prior to the return of any children to her custody."
Regarding addressing the mental health needs of the parents, Ms. Amaio testified that Lisa did attend counseling. On April 29, 1999, DCF received an update on Lisa's progress in counseling.[16] The counselor noted Lisa's positive interest in learning and her desire to follow the court's expectations of her, however, the therapist "questioned Lisa's intellectual capacity to comprehend events relevant to her legal status." CT Page 11631 Ms. Amaio testified that progress was slow in counseling, and ultimately, against the advice of the Center, Lisa discontinued treatment.
While Lisa and Felton were in the process of preparing themselves to parent their two children, Dakota and Acadia were in foster care waiting for them. On June 10, 1999, when Dakota was three-and-a-half years old and had spent all of those years in foster care, DCF filed a termination of parental rights petition concerning Dakota. On November 2, 1999, when Acadia was thirteen months old and had spent all of her life in foster care, DCF filed a petition to terminate Lisa and Felton's parental rights to her. On May 1, 2000, the court (Rogers, J.) entered orders terminating the parental rights of Lisa and Felton to Dakota and Acadia.[17] The court found that Lisa and Felton had abandoned their children as well as had failed to rehabilitate.
On April 3, 2000, during the trial to terminate the parental rights to Dakota and Acadia, DCF became aware of the birth of Avia, the subject of this petition, to Felton and Lisa. DCF contacted the police and conducted a child well check. On April 3, 2001, DCF issued a ninety-six hour hold and on April 5, 2001, DCF filed a neglect and uncared for petition together with an application an Order of Temporary Custody. On April 5, 2000, the court (Santos, J.) granted the application. On April 14, 2000, after a full hearing, the order of temporary custody was sustained. Avia was placed in foster care where she has remained until the present. The parents were once again provided with specific steps.[18]
 B. Events following the filing of the coterminous petitions.
As previously stated, the mandatory ten-day hearing following the granting of the ex-parte order of temporary custody was held on April 14, 2001. After a full evidentiary hearing, the court (Santos, J.), sustained the order of temporary custody resulting in Avia's continued stay in foster care.
The evidence demonstrates that Lisa and Felton visited Avia at the DCF office. Regrettably, the records of these visits are not positive. Avia expressed distress in her parents' presence. The DCF narrative, introduced at trial as a full exhibit[19] provides the details of the visits from September 6, 2000 through December 22, 2000. There is also evidence of visits held in the year 2001 at the Amps, Inc., a supervised visitation center.[20]
That Avia should express discomfort by crying and screaming is not unexpected. Certainly it is reasonable to expect that an infant who is removed from her mother when she is only one week old and CT Page 11632 breast-feeding, taken to a stranger's home to live and then taken to a DCF office to visit with parents that she does not recognize, would experience emotional and physical distress. However, what is not reasonable is that adults, who have engaged in some level of services for at least four years do not demonstrate insight or understanding of the situation. The record tragically details what Avia endured during those visits.
The court understands the anger of the parents' in a situation such as this. After all, Lisa has not yet dealt with the significant and overwhelming loss in her life. Felton, an intelligent man who holds responsible positions in business, has never accepted that the child protection agency should be involved in his life. Fundamentally, he does not comprehend the state's mandate to protect children who have been neglected or abused or are at significant risk of being neglected and abused. All he sees is that the state has consistently removed his children without cause.
The court heard the testimony of Robert D. Meier, Ph.D., the court appointed evaluator. He testified that on November 7, 2000, Lisa and Felton participated in a court ordered psychological evaluation with him. Avia took part in an evaluation of the parent child relationship and interaction.[21] Dr. Meier paints a graphic picture of the psychological functioning of Lisa and Felton, as well as of their parenting abilities. He describes the assessment of Lisa's personality profile as limited due to her "extreme defensiveness or denial . . . such people lack insight into their behavior." He stated that it is difficult to interpret Lisa's profile but "Even with the defensive posture, there were signs of underlying or repressed anger, a high level of cynicism and distrust and a failure to take responsibility for her own actions."
Regarding Felton, Dr. Meier opined that his "profile suggests that in most situations, Felton places a high value on controlling and withholding angry responses. In this particular situation, Felton feels that the actions with regards to Avia were not justified, and admits to feeling a great deal of anger. This profile is consistent with his pattern of generally not expressing anger or hostility in work or social settings, but showing such capability when highly provoked or when feeling directly or wrongly attacked."
The evidence clearly, convincingly and abundantly demonstrates the level of anger and hostility that Felton is experiencing in this matter. As previously stated, the court understands a certain level of anger and the reasons that the parents may believe that the anger is justified. However, the lack of insight into the need for any interventions to meaningfully cope with the anger, is not understandable. Dr. Meier CT Page 11633 described Felton's anger to be of such an intensity that "there is no way to work with him because he has made the decision already and his behavior makes this a self-fulfilling position." In other words, his poisonous written communications regarding DCF, the courts and anyone involved with the case guarantees that his accusations materialize.
The court was presented with evidence of Felton's newsletters and letters to DCF.[22] According to the face of the documents, copies of these documents were provided to the press as well as to an organization known as the World Organization for the Preservation of Families. The court finds the public disclosure of Lisa's personal and private struggles reprehensible. Equally reprehensible is the public disclosure of Avia's private life as a foster child. Notwithstanding that the anger is understandable, and perhaps even justifiable, it is unproductive. Felton and Lisa have consistently stated that they want to raise their children. It should be clear to any reasonable adult that if a pattern of behavior does not produce the desired outcome, the pattern must be re-evaluated and perhaps even changed. A new strategy and approach must be utilized to obtain a satisfactory result. As the saying goes, "if you keep doing what you are doing, you will keep getting what you are getting:" This holds true for systems and organizations, as well as for individuals. It is critical for progress that goals be reviewed and modified as necessary.
In addition to all of this going on around little Avia's life, she was evaluated on January 2, 2001, by a specialist at the Connecticut Children's Medical Center for a condition known as Neurofibromatosis type I. This evaluation was necessary because Lisa has a "pericentric balanced inversion of chromosome eighteen (18) and a previous child with a Neurofibromatosis type I."[23] Dakota has been diagnosed with this condition. According to the medical evaluator, Avia will need to be monitored closely and given additional tests in the future to determine her level of risk to develop the condition.
2. NEGLECT ADJUDICATION
In hearing coterminous petitions for neglect and termination, the court "first determines whether the child is neglected, uncared for or dependent by a fair preponderance of the evidence; if so, then the judicial authority determines whether statutory grounds exist to terminate parental rights by clear and convincing evidence; if so, then the judicial authority determines whether termination is in the best interest of the child by clear and convincing evidence." Connecticut Practice Book (Rev. 1999) § 33-12.
Since Avia was in her parents' care for only one week prior to her CT Page 11634 removal, this case necessarily involves the court to look at not only what happened during that one week, but also what could happen in the future. "Our statutes clearly permit an adjudication of neglect based on a potential for harm or abuse to occur in the future . . . By its terms, § 17a-101(a) connotes a responsibility on the state's behalf to act before the actual occurrence of injury or neglect has taken place." In reMichael D., 58 Conn. App. 119, ___ A.2d ___ (2000).
In accordance with the statutory requirements and the case law the court finds by a fair preponderance of the evidence that both parents neglected Avia by allowing her to live under conditions injurious to her well being during that one week and would have continued to neglect her, as that term is defined in our statutes. The court adjudicates Avia a neglected child.
3. TERMINATION ADJUDICATION
 A. Reasonable Efforts
DCF alleges that Lisa and Felton are unable to or are unwilling to benefit from reunification efforts. Connecticut General Statutes §17a-112(j)(1) requires the court to find "by clear and convincing evidence that DCF has made reasonable efforts to locate the parents and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110
or section 17a-111b that such efforts are not appropriate."
Pursuant to the Adoption and Safe Families Act (42 U.S.C. § 671(a) (15)), Connecticut amended its statutes in 1998 to eliminate the need for DCF to make reasonable efforts to reunify parents with children under circumstances where ". . . The parent has killed, through deliberate, nonaccidental act, a sibling of the child . . ." Connecticut General Statutes § 17a-111b(a)(2). This section allows DCF to petition the court, at any time, for a determination that reasonable efforts to reunify are no longer appropriate. Here, there has been no prior court determination that reasonable efforts to reunify Avia with her parents are no longer necessary.
The court finds that the Lisa and Felton are unable and unwilling to benefit from efforts to reunify. Notwithstanding this finding, the court further finds that throughout the four years that DCF has been involved with this family, reasonable efforts have been made to keep this family together. As stated previously, Felton does not believe that he needs services and Lisa has been unable to gain the necessary insight to CT Page 11635 effectively and safely parent her children.
B. Termination Adjudication
 1. As to Lisa.
The court finds by clear and convincing evidence that Lisa is Avia's mother, that Avia is under the age of seven, and is neglected, and she has failed, is unable and unwilling to achieve such a degree of personal rehabilitation as to encourage the belief that she could assume a responsible position in Avia's life and her parental rights to two other children have been terminated pursuant to a DCF petition. Connecticut General Statutes § 17a-112(j)(3)(E).
Additionally, the court finds by clear and convincing evidence that Lisa has killed, through a deliberate non-accidental act, a child previously born to her. Connecticut General Statutes § 17a-112(j)(3)(F).
2. As to Felton
The court finds by clear and convincing evidence that Felton is Avia's father, that she is under the age of seven, that she is neglected and he has failed to achieve such degree of personal rehabilitation as to encourage the belief that he could assume a responsible position in Avia's life, and his parental rights to two other children have been terminated pursuant to a DCF petition. Connecticut General Statutes § 17a-112(j)(3)(E).
4. REQUIRED FINDINGS
1. Appropriate and timely services were provided by DCF to this family for at least a period of four years. Those services included parent training, counseling, visitation coordination, and case management services. The services offered were extensive. The parents were unable and unwilling to benefit from these services.
2. The court finds by clear and convincing evidence that DCF made reasonable efforts to reunify this family, given the situation and circumstances, as far as possible. The parents have received ongoing and significant services for rehabilitation. Felton has refused to participate and Lisa has been unable to rehabilitate herself.
3. DCF set reasonable and realistic goals embodied in the specific steps set forth with the filing of the coterminous petitions. Neither parent was able to fulfill these steps. CT Page 11636
4. Avia has interacted with her parents during visitation. The experience has not been positive. Avia is bonded to her foster parents who have met her needs during her stay with them.
5. Avia is seventeen months old. She was born on March 2000.
6. The court finds that the parents have made efforts to maintain contact with Avia. However, these efforts were inconsistent. As stated previously, the parents have been unable to adjust their conduct to make a return home of Avia an option in the foreseeable future, given Avia's own needs for permanency and stability of care.
7. No inappropriate conduct is noted on the part of DCF or anyone so as to prevent the parents from having a meaningful relationship with Avia.
5. DISPOSITION
Avia has spent all of her life in foster care. She is in need of permanency. If Lisa and Felton were to seriously attempt to deal with their life issues, they would require an additional period of time to begin the process of overcoming their denial, confronting their weaknesses and dealing with the unhealthy level of anger. DCF has been providing services to Lisa for over four years. Felton has simply refused to participate in services, insisting on engaging in a pattern of name-calling, insults, threats and intimidation. There is no reasonable basis to believe that given either of them additional time would be in Avia's best interest. The court concludes, based on clear and convincing evidence, that termination is in Avia's best interest. Accordingly, a termination of the parental rights of Lisa F. and Felton K. is ordered. The Commissioner of the Department of Children and Families is hereby appointed statutory parent for the purpose of securing an adoptive family and permanent placement for her. The Commissioner shall file a report with the court within thirty days. Said report shall comply with State and Federal law.
Carmen L. Lopez, Judge Child Protection Session